SUBSEQUENT INJURY FUND *v.* WILLIAM OLIVER HOWES

[No. 253, September Term, 1970.]

*Decided February 25, 1971.*

The cause was argued before ORTH, MOYLAN, and POWERS, JJ.

*Albert A. Levin, Special Assistant Attorney General,* with whom was *William H. Kable* on the brief, for appellant.

*James S. McAuliffe* for appellee.

POWERS, J., delivered the opinion of the Court.

An accidental injury sustained on June 16, 1966 by William Oliver Howes during the course of his employment as a furnace cleaner for Metropolitan Fuels Company, Inc., was followed in due course by his compensation claim. Further proceedings arising out of the claim require us to determine what the Subsequent Injury Fund is, and what it may do and must do under Maryland law. This appeal by the Subsequent Injury Fund was taken from an "opinion and order" of the Circuit Court for Montgomery County granting a motion by Howes for summary judgment. Hereafter in this opinion we shall refer to the Subsequent Injury Fund as the Fund, to Mr. Howes as Claimant, to the Workmen's Compensation Commission as the Commission, and to Metropolitan Fuels Company, Inc. and its workmen's compensation insurance carrier as Employer and Insurer.

## Procedural History of the Case

Claimant duly filed his claim with the Commission which, after hearing, passed an order on October 31, 1967 against the Employer and Insurer finding that the Claimant sustained a permanent partial disability amounting to 30% industrial loss of use of his body as a result of an injury to his heart, and further found that of that

disability 15% was attributable to the accidental injury and 15% was attributable to a pre-existing condition.

Dissatisfied with the finding of the Commission, Claimant filed an order for appeal to the Circuit Court for Montgomery County alleging in his petition that he sustained a permanent partial disability of 50%, none of which was attributable to a pre-existing condition. this first appeal was pending, Claimant with leave of court filed an amended order and petition alleging that he sustained a permanent total disability or a permanent partial disability amounting to 50% or more, none of which was attributable to a pre-existing condition.

As will be seen later in this opinion, that amended claim on appeal exposed the Fund to the potential risk of an order upon it for payment of money. Thereupon, the Employer and Insurer filed a motion to continue the case and to remand it to the Commission so that the Fund could be impleaded as a party. Claimant opposed this motion and took the position that the Fund was not involved and would not be involved because of his contention that none of his disability was attributable to a pre-existing condition.

Thereafter, the Employer and Insurer filed in the pending appeal a pleading which purported to be a third party claim against the Fund. Counsel presumably appearing for the Fund filed a motion to dismiss the appeal as to it and the motion was granted.

The case then proceeded to trial on June 27, 1968 before a jury under the provisions of Code, Art. 101, § 56. It does not appear that any questions of law were raised at the trial of the appeal, as may be done under § 56 when misconstruction of the law is asserted. Questions of fact were submitted to the jury, and it determined as a matter of fact that Claimant had a permanent partial disability of 90%, and of that amount, 15% was because of a pre-existing disease or infirmity.

A certified copy of the docket entries in the Circuit Court, recording the findings of the jury on the issues submitted to it, was then transmitted to the Commission.

Thereafter the Commission passed an order on December 20, 1968 awarding the Claimant compensation payable by the Employer and Insurer for a 75% permanent partial disability. Claimant promptly requested a hearing before the Commission on the ground that the award did not comply with the jury's findings, but on January 20, 1969 filed a new appeal in the circuit court from the December 20th order. This second appeal lay dormant until December.

The Commission held a hearing in February, 1969 on the issues of whether the Fund was a party and whether to make an award for the additional 15% permanent partial disability, to be paid from the Fund. On October 23, 1969 it declined to do so, finding that the Fund was not a party to the claim at the initial hearing nor in the appeal from the order which followed that hearing and that any further proceedings against the Fund were *res judicata*. From the Commission order of October 23, 1969, Claimant filed a third appeal which in December was consolidated with the pending second appeal. Claimant then filed a motion for summary judgment in his favor in the two cases. The Fund filed a motion to dismiss the two appeals on the ground that it had been dismissed as a party in the first appeal and the principle of *res judicata* barred the two subsequent appeals.

Claimant's motion for summary judgment did not specify against what or against whom judgment should be entered. Neither the second nor the third appeal was captioned against the Subsequent Injury Fund. However, after mail receipt of the papers, an Assistant Attorney General "appeared" for the Fund, and participated as if it were a party. The Employer and Insurer showed no interest, and indeed had none, in these appeals.

After hearing arguments on the motion the court, on April 3, 1970, in a brief ruling (later transcribed and filed) said: "For these reasons the Court will grant, and does grant, the motion for summary judgment on behalf of the appellant in this case." The docket entry merely records that the motion was granted. An order to enter

an appeal "on behalf of the Subsequent Injury Fund" was filed by the Assistant Attorney General. The record before us has been supplemented, with leave of court, by the record in the Claimant's first appeal.

## Statutory History of the Fund

The concept of providing some means of compensating an injured employee for that portion of disability which pre-existed the injury upon which a current claim is based was first introduced into the law of Maryland when Acts of 1945, ch. 637 was passed and became effective on June 1, 1945. This act created a special fund known as the "Second Injury Fund" and provided that if an employee who had previously lost or lost the use of a hand, arm, foot, leg or eye, lost another of those members or organs in a compensable accidental injury and thereby became permanently and *totally* disabled, the employee was entitled to receive additional compensation beyond that awarded against the employer for the current injury, such additional compensation to be paid from the Second Injury Fund upon the written order of the Commission. The Treasurer of the State of Maryland was made custodian of the fund with limited administrative responsibilities. The Second Injury Fund was provided with only one source of income, produced by charges against employers or their indemnitors at a flat rate per accidental injury occurring after June 1, 1945. These payments were made to the Commission, and by it remitted to the State Treasurer.

The intent of the 1945 act was stated to be, "* * * to make the total payments to which such employee shall become entitled equal to the compensation that would be due for permanent total disability." The act also contained a provision that in any case which shall come before the Commission involving payments from that fund, the Commission may, if it deems it necessary or desirable, request the Attorney General to furnish a member of his staff to represent the fund in hearings before it.

The Second Injury Fund thus created appeared to op-

erate satisfactorily without major statutory change and without appellate judicial interpretation until 1963. Amendments not significant here were made by Acts of 1955, ch. 597, and Acts of 1957, ch. 584.

Acts of 1963, ch. 809, codified as Code, Art. 101, § 66, accomplished a major broadening of the original concept. The Subsequent Injury Fund was created and succeeded to the function of and pending claims against the Second Injury Fund. Orders by the Commission for payment from the Fund were no longer limited to cases of permanent *total* disability caused by the loss of a second enumerated member or organ. The 1963 changes provided for payments of additional compensation to an injured employee who sustained any injury in a compensable accident while previously suffering any kind of permanent impairment due to a previous accident or a disease or any congenital condition provided that the end result was permanent total disability *or* permanent partial disability exceeding 50% of the body as a whole.

The act still provided for payments by employers or their insurers to the Commission, but based upon a percentage of awards rather than upon a flat rate, and still required that all such payments be remitted by the Commission to the State Treasurer. Another change of some significance was that the Commission was required rather than merely permitted to request the Attorney General to furnish a member of his staff to represent the Fund in hearings before it in any case involving payments from the Fund. It failed to specify how the Commission, prior to its finding, should determine that a case would be one involving payments from the Fund.

Acts of 1964, ch. 56 amended § 66 to correct grammatical errors only, and Acts of 1967, ch. 154 increased the assessment percentage for payments to the Commission to be remitted to the Fund and increased the upper and lower limits of the level at which the fund was to be maintained. After the opinion of the Court of Appeals in *Subsequent Injury Fund v. Pack,* 250 Md. 306, 242 A. 2d 506 (1968) which will be discussed below, the law

was further amended by Acts of 1969, ch. 394. Code, Art. 101, § 56 (a) was amended by inserting, "for the purposes of this Section, the word 'person' shall be deemed to include the Subsequent Injury Fund as created by Section 66 of this Article." This act also added to Code, Art. 101, § 66 (5) the sentence, "In the event of any award against the Subsequent Injury Fund, there shall be a right of appeal by the Subsequent Injury Fund, as provided in Section 56 (a) of this Article." This 1969 act was passed as an emergency measure and by its terms took effect on April 23, 1969.

### Judicial History of the Fund

The meager reported judicial history of the Fund discloses two cases in the Court of Appeals, *Richard F. Kline, Inc. v. Grosh*, 245 Md. 236, 226 A. 2d 147 (1967), and *Subsequent Injury Fund v. Pack, supra*. In *Kline* the Fund was involved only to the extent of a holding that the statute creating it had no application to that case because its effect was prospective only and the second injury there occurred before its effective date. The injury was of such a nature that it did not qualify under the earlier provisions of the Second Injury Fund.

In *Pack*, however, Judge Finan, speaking for the Court, made an extensive analysis of the status of the fund. The Court said, pages 311 and 312:

> "The narrow question, therefore, is whether the Fund is a 'person.' It is actually nothing more than a glomerate of money, to be disbursed by the State Treasurer on written orders of the Commission. It is not supervised, maintained or protected by a governing board, which is given the authority to appeal, as is the Unsatisfied Claim and Judgment Fund. See, Code (1957), Art. 66½, §§ 150-179 (1967 Repl. Vol.). Nor is it an agency of the State, created and designated as such by the Legislature, as is the State Accident Fund. See, Code (1957), Art. 101, §§ 70-71

(1964 Repl. Vol.). It is not a commission, corporation, trustee or other artificially created 'person'."

"* * * In the argument before this Court the questions were raised as to whether the attorney to the Fund, on his own motion, could take an appeal on behalf of the Fund, or whether the State Treasurer who is the statutory custodian of the Fund could take an appeal from the Commission's decision. We think *Switkes v. John McShain, Inc.*, 202 Md. 340, 96 A. 2d 617 (1953) renders such action by the attorney to the Fund a nullity. Regarding the State Treasurer, § 66 (2) of Art. 101 imposes upon him duties which are purely ministerial, charging him with keeping the surplus funds invested and further providing:"

"* * * The fund shall be disbursed by the Treasurer only for the purposes stated in this section, and shall not at any time be appropriated or diverted to any other use or purpose. * * * Disbursement from the fund shall be made by the Treasurer only upon the written order of the Workmen's Compensation Commission."

"We do not think the statute gives the Treasurer the right, nor places upon him the duty, to pass upon the legal merits of claims adjudicated by the Commission and awarded against the Fund. An award by the Commission is not the type or character of diversion of money from the Fund to which the statute makes reference and from which the Treasurer is charged with protecting the Fund."

Also with respect to the Fund's status at that time, the Court said, at pages 313 and 314:

"Furthermore, the contention that exposing the Subsequent Injury Fund to inroads from awards by the Commission, without the right to appeal

such decisions, violates the equal protection clause of the Fourteenth Amendment of the United States Constitution is specious, for the simple reason that the Fund is not a person or legal entity cognizable under Maryland Law, to whom the equal protection clause would apply."

### Status of the Fund in this Case

Until April 23, 1969, the Fund was incapable of being a party to any proceeding anywhere, before the Commission or in any court; it could make no claim nor could a claim be asserted or prosecuted against it; it could not appear, nor could counsel appear for it as a party; it could not appeal, nor could any party appeal against it; it was not an entity, but a nonentity; it was, and still is, a bank account and portfolio of investments, in the custody of the State Treasurer, from which payments are made when the Commission orders payment.

The provision of the statute that requires the Commission, in any case before it involving payments from the Fund to request the Attorney General to furnish a member of his staff "to represent the fund in hearings before it" does no more than provide a public official to act in a capacity analagous to that of a friend of the court. We recognize the incongruity of a procedural system that can have the results we have seen here. Before the Commission, when a claimant asserts a disability of the body as a whole which does not exceed 50%, or if more, that all of it resulted from the accidental injury upon which the claim is based, there is nothing to foreshadow an award against the Fund. With no such award made, either the claimant or the employer may appeal to the circuit court, and a trial in which the Fund has no adversary voice may result in findings which thereafter *require* the Commission to make an award against the Fund. However, this dilemma is for legislative, not judicial correction.

Apparently seeking to give the Fund a degree of vitality after *Pack* made clear that it had none, the legislature passed Acts of 1969, ch. 394. When it went into

effect on April 23, 1969, the Claimant's first appeal, determining the extent and nature of his permanent partial disability, had been concluded. His second appeal had been filed in January 1969. When the third appeal was taken on November 21, 1969 the Fund had the rights given it by the Acts of 1969.

Until the Claimant filed this third appeal the Fund was not and could not be a party to any of the Commission or court proceedings recited. Any attempt by either to treat the Fund as a party was without legal effect. Since the Commission made no award against it, the Fund had no standing in the circuit court, even in the third appeal, by reason of the right of appeal given it by the 1969 amendment to Code, Art. 101, § 66 (5). Nor did it have standing flowing from the amendment to § 56 (a) defining it as a "person" in the section which permits any "person feeling aggrieved" to have the decision of the Commission reviewed in a proceeding in the nature of an appeal.

However, § 56 (a) also provides that an appeal shall lie from the judgment of the circuit court as in other civil cases. At the time of the judgment in the court below, the Fund was a "person" for appeal purposes, and the judgment had the effect of an award against it. For the purpose of disposing of this appeal, we shall assume that the Fund is properly here.

## The Merits of Claimant's Position

When the Claimant felt aggrieved by the Commission's first decision as to the extent of his permanent partial disability, he properly sought and obtained the review which the law afforded him. The result was a factual determination by the jury of the extent of his disability, and the portion which pre-existed his accidental injury. Upon receipt of the docket entries showing this factual determination, the proper course for the Commission was to proceed as if the Commission itself had found the same facts, and enter an order for payments of compensation to the Claimant under the law by the Employer and In-

surer for the accidental injury, and after their completion, additional payments under § 66 (1) from the Fund, to accomplish the declared legislative intent "to make the total payments to which such employee shall become entitled equal to the compensation that would be due for the combined effects of the impairment and subsequent injury." This is what the Commission's order of December 20, 1968 should have done. In failing to do it, the Commission misconstrued the law, and the circuit court, in the Claimant's appeal to it, had only to modify the Commission's order to apply the law correctly.

To avoid adding unnecessarily to the mass of procedural confusion already accummulated, we shall treat the granting of Claimant's motion for summary judgment by the circuit court as an order construing the law and modifying the Commission's finding, all in accordance with this opinion, and as such, affirm the judgment.

*Judgment affirmed, appellant*
*to pay costs.*